## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| SHIVA STEIN, Derivatively On Behalf Of COMPASS MINERALS INTERNATIONAL, INC., | Civil Action No. |
| Plaintiff, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT |
| vs. | |
| KEVIN S. CRUTCHFIELD, RICHARD P. DEALY, EDWARD C. DOWLING, JR., ERIC FORD, GARETH JOYCE, MELISSA M. MILLER, JOSEPH E. REECE, LORI A. WALKER, PAUL S. WILLIAMS, AMY J. YODER, FRANCIS J. MALECHA, JAMES D. STANDEN, and ANTHONY J. SEPICH, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| COMPASS MINERALS INTERNATIONAL, INC., | |
| Nominal Defendant. | |

Shiva Stein ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning herself, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes a review and analysis of: filings in various proceedings, including a class action lawsuit captioned, *Local 295 IBT Employer Group Welfare Fund v. Compass Minerals International, Inc.*, 22-cv-02432 (D. Kan.) (the "Securities Action") alleging Compass Minerals International, Inc. ("CMI" or the "Company") and its executives violated the federal securities laws; CMI's filings with the U.S. Securities and Exchange Commission ("SEC"); CMI's press releases, website, corporate governance documents, presentations, and conference calls; and  analyst reports and other publicly available information concerning the Company and

its Board of Directors (the "Board").

## NATURE OF THE ACTION

1.      This stockholder derivative action is brought on behalf of CMI against certain current and former CMI executives and members of the Board (the "Individual Defendants")[1] for, among other things, breaching their fiduciary duties to the Company's stockholders by intentionally or recklessly making or permitting the dissemination of false and misleading statements regarding the Company's business, assets, prospects, and internal controls.

2.      CMI mines and produces essential minerals and specialty plant nutrition minerals for consumer, industrial, and agricultural uses. The Company operates three business segments: the Salt segment, the Plant Nutrition North America segment, and the Plant Nutrition South America segment. The Salt segment represents approximately 60% of the Company's consolidated historical revenues. Within the Salt segment, CMI operated the largest underground rock salt mine in the world in Goderich, Ontario, Canada ("Goderich" or the "Goderich Mine"), which historically accounts for roughly one-third of the Company's earnings.

3.      In 2017, defendants announced that the Company was investing in upgrades to the Goderich Mine, including with respect to continuous mining and continuous haulage ("CMCH") equipment.  Defendants repeatedly assured investors that the upgrade was on track to materially reduce costs and boost the Company's operating results starting in 2018. Defendants' statements were misleading because they failed to tell investors that costs at the Goderich Mine were increasing rather than decreasing. Defendants also misrepresented the amount of salt the Company was able to produce at Goderich, and failed to disclose how the known and ongoing production

---

[1] The "Individual Defendants" are Kevin S. Crutchfield, Richard P. Dealy, Edward C. Dowling, Jr., Eric Ford, Gareth Joyce, Melissa M. Miller, Joseph E. Reece, Lori A. Walker, Paul S. Williams, Amy J. Yoder, Francis J. Malecha, James D. Standen, and Anthony J. Sepich.

shortfalls it was experiencing were reasonably expected to reduce its future operating income.

4.      On October 23, 2018, the Company pre-announced third quarter 2018 financial results that were significantly below expectations and lowered its outlook for the remainder of the year. Following this announcement, the price of CMI stock declined by more than 30% over the following two days. Then, before the market opened on November 19, 2018, the Company announced the abrupt termination of its Chief Executive Officer ("CEO"), Defendant Malecha. Following this announcement, the price of CMI stock declined by 8% over the following three days.

5.      On September 23, 2022, the SEC announced that it had "settled charges against [CMI] for misleading investors about a technology upgrade that the company claimed would reduce costs at its most significant mine, but in reality, had increased costs, and for failing to properly assess whether to disclose the financial risks created by the company's excessive discharge of mercury in Brazil."[2] ***The SEC ordered that CMI pay $12 million to settle the charges*** (the "SEC Order").  The SEC Order found that CMI violated the antifraud, reporting, and internal controls provisions of the Securities Act and the Exchange Act and various related rules. In addition to the civil penalty, CMI "agreed to cease and desist from further violations of these provisions, and retain an independent compliance consultant to review and make recommendations concerning its disclosure controls and procedures."

6.      The Individual Defendants knowingly or recklessly made false and misleading statements and facts and issues that were unquestionably material to shareholders, including with regard to (a) the operating costs associated with the new CMCH mining system; (b) the Company's ability to produce targeted levels of salt with the new CMCH mining system; (c) the salt production

---

[2] Press Release, SEC, September 23, 2022, available at https://www.sec.gov/news/press-release/2022-171.

capacity at the Goderich Mine; (d) anticipated annual cost savings and realized cost savings attributed to the new CMCH mining system; (e) the financial results of the Company; and (f) the adequacy of the Company's internal controls.

7.    As a result of the foregoing, CMI and defendants Malecha, Standen, and Sepich have been named as defendants in the Securities Action (the "Securities Defendants") which alleges investors were damaged when the purchased CMI shares from between October 31, 2017 and November 18, 2018.

8.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the costs of defending and paying class-wide damages in the Securities Action, as well as additional losses, including reputational harm and loss of goodwill.

9.    Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act. Demand is excused because among other reasons a majority of the current Board faces a substantial likelihood of liability for the misconduct alleged herein.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

11.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.    This action is not a collusive action designed to confer jurisdiction on a court of the

United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because nominal defendant CMI is headquartered in this District and conducts business in this District.

## THE PARTIES

*Plaintiff*

14.     Plaintiff currently holds shares of CMI common stock and has been a continuous holder at all relevant times.

*Nominal Defendant*

15.     CMI is a Delaware Corporation headquartered in Overland Park, Kansas.

*The Individual Defendants*

16.     Defendant Kevin S. Crutchfield has served as the Company's President, Chief Executive officer ("CEO") and a Company director since May 2019.

17.     Defendant Richard P. Dealy has served as a Company director since May 2022.

18.     Defendant Edward C. Dowling, Jr. has served as a Company director since March 2022.

19.     Defendant Eric Ford has served as a Company director since August 2011.

20.     Defendant Gareth Joyce has served as a Company director since October 2021.

21.     Defendant Melissa M. Miller has served as a Company director since July 2022.

22.     Defendant Joseph E. Reece has served as a Company director since March 2019.

23.     Defendant Lori A. Walker has served as a Company director since 2015.

24.     Defendant Paul S. Williams has served as a Company director since June 2009.

25.     Defendant Amy J. Yoder has served as a Company director since May 2012.

26.    Defendant Francis J. Malecha served as the Company's CEO between October 31, 2017 and November 18, 2018.

27.    Defendant James D. Standen served as the Company's CFO between October 31, 2017 and November 18, 2018.

28.    Defendant Anthony J. Sepich served as Senior Vice President, Salt segment between October 31, 2017 and November 18, 2018.

***Non-Parties***

29.    Jon Chisholm ("Chisholm") has served as a Company director since November 2022.

30.    Shane Wagnon ("Wagnon") has served as a Company director since November 2022.

## DEFENDANTS' FIDUCIARY DUTIES

31.    By reason of their positions as officers, directors and/or fiduciaries of CMI and because of their ability to control the business and corporate affairs of CMI, Defendants owed CMI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

32.    The Individual Defendants were and are required to act in furtherance of the best interests of CMI and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interest or benefit.

33.    Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. To discharge

their duties, officers and directors of CMI were required to, among other things:

a. Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with all applicable district, state, and federal laws rules, regulations, and requirements, and pursuant to CMI's Code of Conduct and internal guidelines;

b. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to provide the highest quality performance of its business;

c. Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

d. Maintain and implement an adequate system of internal legal, financial, and management controls to ensure that CMI's operations would comply with all laws and that CMI's regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

e. Refrain from unduly benefitting themselves and other Company insiders at the expense of the Company; and

f. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to rectify the misconduct and prevent its recurrence.

34.    The Individual Defendants had a duty to prevent the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings and business prospects. As fiduciaries, the Individual Defendants had a duty to disclose in regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and

the common stock price would be based on accurate information and to preclude deceptive practices in the market.

35.    The Individual Defendants, because of their position of authority as directors and/or officers of CMI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

38.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

39.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors and or officers of CMI, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.    Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

41.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of CMI and at all times acted within the course and scope of such agency.

## CMI'S CODE OF BUSINESS CONDUCT

42.     CMI's Code of Ethics and Business Conduct (the "Code of Conduct") applies to all Company employees, officers and directors.

43.     The Code of Conduct provides that:

As a publicly traded company, we have the responsibility to protect the interest of our stockholders. Acting with responsibility and transparency goes hand in hand with our Core Values of Integrity and Value Creation. We create value for our stockholders by maintaining accurate business records and ensuring our financial statements accurately reflect our business, our earnings and our financial condition.

44.     With respect to financial statement integrity, the Code of Conduct provides:

The integrity of our financial statements is at the center of our integrity as a company. Any actual or perceived irregularities in our financial statements must be reported to the Chief Financial Officer, Corporate Controller, General Counsel, Audit Committee Chair or the Ethics Hotline.

*     *     *

As a public company, it is critical that all external communications with investment analysts, the media, and investors be consistent and accurate. Public statements on our company's behalf must be made only by the appropriate source within the company.

## CMI'S AUDIT COMMITTEE CHARTER

45.     The primary function of the Audit Committee is to assist the Board with its oversight responsibilities regarding (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and the independent auditor.

46.     The Audit Committee Charter delineates the duties and responsibilities of the committee as follows:

1. The Committee may, in its discretion, conduct or authorize investigations into any matters within the scope of its responsibilities and powers. The Committee will have access to all books, records, and employees of the Company.

2. The Committee will discuss with management and the independent auditor any related-party transactions brought to the Company's attention which could reasonably be expected to have a material impact on the Company's financial statements or on the independence of any members of the Board.

3. The Committee will discuss with management the Company's overall policies with respect to its risk identification, assessment and management processes. The Committee will discuss with management the Company's significant financial risk exposures and the actions management has taken to limit, monitor or control such exposures.

4. The Committee will discuss with the Company's General Counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

5. The Committee will request assurances from the Company's management, the Company's internal auditor and the independent auditor that the Company's foreign subsidiaries and foreign affiliated entities are in conformity with applicable legal requirements, including disclosure of insider and affiliated party transactions.

6. The Committee will periodically review the Company's insurance programs, including those relating to property, general liability and director and officer liability, with the proposed director and officer insurance program to be presented to the full Board for approval.

7. The Committee will review and discuss with the Company's management the Company's procedures for compliance with applicable laws and regulations.

8. The Committee will annually review and approve the general use of swap transactions by the Company and its subsidiaries.

9. The Committee will review and discuss with management, tax policies, accruals,

developments, disputes and other related matters.

10. The Committee will sponsor periodic training for the Board on audit, accounting, financial, compliance and related matters.

11. The Committee will, at least annually, evaluate its own performance including its compliance with this Charter, and report the results of such evaluation, including any recommended changes, to the Board.

12. The Committee will, at least annually, review and reassess this Charter and submit any recommended changes for approval by the Board.

## SUBSTANTIVE ALLEGATIONS

47. On October 30, 2017, CMI filed with the SEC a Form 8-K announcing its financial results for the third quarter of fiscal 2017. The next day, the Company held an earnings call, during which defendant Malecha assured investors:

> Installation of continuous mining and haul systems at the Goderich mine is also on track, even with the partial roof collapse we experienced in September. We are currently commissioning the final continuous mining system and expect to complete this in 2017 in fourth quarter.

> \*       \*       \*

> Our cost-savings plan initiated in July as part of this overarching effort to improve our operational performance and increase efficiency. This plan to eliminate $20 million in ongoing costs in 2018 is on track. These savings are in addition to the $30 million in cost reductions we expect to achieve in 2018 from our investment in continuous mining at Goderich.

48. The same day, October 31, 2017, CMI filed with the SEC a Form 10-Q for the third quarter of fiscal 2017, which attributed the decrease in Salt segment earnings and gross profits to various costs overruns, unrelated to the CMCH transition:

> A $6.2 million decrease in Salt segment gross profit partially offset the plant nutrition business' increase. The decrease was primarily due to lower consumer and industrial sales volumes, higher per-unit shipping costs and restructuring costs.

> \*       \*       \*

> Salt operating earnings decreased 25%, or $7.5 million, due to lower sales as well as increased logistics costs and approximately $2 million of restructuring costs applicable to the Salt segment.

49.     On February 13, 2018, CMI filed with the SEC a Form 8-K announcing its financial results for the fourth quarter of fiscal 2017.  The following day, February 14, 2018, CMI held an earnings call, during which defendant Standen stated:

> [W]e expect a healthy rebound in operating margins in the second half of 2018. Second half 2018 margins will also benefit from continuous mining savings at Goderich. We already achieved about $5 million of savings in 2017 when we finished installing the fourth [CMCH] mining system and completely stopped drilling and blasting in the fourth quarter.
>
> *       *       *
>
> Our Goderich mine transition is already delivering benefits, and is expected to deliver $30 million in run rate savings by the end of 2018 . . . .

50.     Following the release of the fourth quarter 2017 results, CMI's stock price declined by 9.1% over the following two trading days.

51.     On February 27, 2018, CMI filed with the SEC a Form 10-K for the fiscal year ended December 31, 2017. In the Form 10-K, the Company disclosed the "Annual Production Capacity" for Goderich as eight million tons of salt per year. The Company represented that:

> Annual production capacity is our estimate of the tons that can be produced assuming a normal amount of scheduled down time and operation of our facilities under normal working conditions, including staffing levels, based on actual historical production rates. As we introduce new production methods, such as continuous mining at our Goderich salt mine, we will update our estimates if necessary as new production data become available.
>
> *       *       *
>
> We continue to invest in our continuous mining project at our Goderich mine. We shifted all of our Goderich mine production to continuous mining in the fourth quarter of 2017, and we expect this project to generate annual cost savings of approximately $15 million in 2018 and $30 million in 2019 if all efficiencies are realized.

52.     Also on May 2, 2018, CMI filed with the SEC a Form 10-Q for the first quarter of fiscal 2018. In the Form 10-Q, the Company attributed the decrease in Salt operating earnings to various costs overruns, unrelated to the CMCH transition:

Salt operating earnings decreased 25%, or $11.3 million, due to higher per-unit product and logistics costs as well as higher-cost inventory produced in 2017 and sold in the first quarter of 2018. The higher per-unit product and logistics costs resulted from lower production at our Goderich mine due to a ceiling fall that occurred last year, leading to deliveries of salt from our Cote Blanche, Louisiana mine to our Northern markets.

53.     On August 6, 2018, CMI filed with the SEC a Form 8-K announcing its financial results for the second quarter of fiscal 2018. The following day, August 7, 2018, CMI held an earnings call during which defendant Malecha stated:

The second important takeaway is that we believe we have all the pieces in place to drive more efficiency through our salt operations, and particularly, at our Goderich mine. Our continuous mining and continuous haulage systems at the mine are ramping up and served as well during the work stoppage. As we have previously reported, we estimate that this investment has already delivered approximately $5 million in ongoing annualized cost savings.

*       *       *

I think we expect to ramp-up coming out of this work stoppage to kind of a monthly rate that would drive our production up to – we've always kind of talked about the 7 million ton range at Goderich. And we expect to be able to operate at that level with the equipment, with the employees there going forward as we ramp-up and come out of the strike.

54.     The same day, CMI filed with the SEC a Form 10-Q for the second quarter of fiscal 2018. The Company attributed the decrease in Salt operating earnings to various costs overruns, unrelated to the CMCH transition:

Salt operating earnings decreased 17%, or $9.5 million, due to higher per-unit product and logistics costs in North America as well as higher-cost inventory produced in 2017 and sold in 2018. The higher per-unit product and logistics costs resulted primarily from lower Goderich mine production levels and higher carryover inventory costs due to the Goderich mine ceiling fall in the second half of 2017.

55.     Following the release of the second quarter 2018 results, the price of Compass Minerals stock declined by 4.3%.

56.     On September 12, 2018, defendants Standen and Sepich spoke at the Credit Suisse

Basic Materials Conference. Defendant Sepich presented a slide showing the ramp-up of production at Goderich and stated: "As you can see on this chart, we're about 75% of the way to our targeted rates." This indicated that the Goderich mine was currently producing about 450,000 tons of salt per month.

57.     The Individual Defendants' representations about the Goderich Mine, including the purported cost savings and expected production outputs associated with the CMCH equipment upgrades, were each false and misleading when made or omitted information necessary to make the statements not misleading. In reality, defendants knew, or intentionally or recklessly disregarded, and failed to disclose that:

a.   Goderich's new CMCH mining system resulted in additional operating costs rather than cost savings.  To hide operating costs associated with the CMCH upgrade, defendants blamed cost overages on unrelated, one-off items, such as a mine ceiling collapse incident;

b.   Goderich's new CMCH mining system was unable to produce targeted levels of salt during this period.  Indeed, the Company's salt production consistently fell below internal expectations and was less than one-half of the salt it needed to produce to generate the anticipated cost savings;

c.   The purported annual salt production capacity for Goderich of eight million tons was significantly overstated.  Although Goderich had been able to produce nearly eight million tons of salt annually using drill-and-blast mining, Goderich was discontinuing that method of producing salt, and the CMCH system was not capable of mining that level of salt during this period;

d.   The purported anticipated annual cost savings attributed to the new CMCH mining

system were overstated.  Even at targeted production levels, Goderich's CMCH

mining system was expected to generate significantly less than the $30 million in

annual cost savings the Company had represented to investors;

e.   The purported realized cost savings attributed to the new CMCH mining system

were significantly overstated. Cost savings generated by other unrelated projects at

Goderich were attributed to the CMCH upgrade; and

f.   As a result of the foregoing, their statements about CMI's Salt segment business

condition, prospects, and internal controls were materially false and misleading

when made.

58.   On October 23, 2018, CMI filed with the SEC a Form 8-K to pre-announce

disappointing third quarter 2018 financial results and lower its outlook for the remainder of the

year. Specifically, the Company disclosed that "production rates at its Goderich, Ontario, salt mine

were lower-than-expected for the third quarter of 2018." The release continued:

> We are disappointed with our salt segment earnings, which were pressured this
> quarter by lower-than-expected production at our Goderich mine. Our employees
> are making improvements each month to ramp up production with our new
> continuous mining systems; however, the pace of improvement continues to be
> slower than expected since the end of the strike. Our new guidance reflects this
> slower ramp-up for the remainder of the year

59.   Following this announcement, the price of CMI stock declined by more than 30%

over the following two days.

60.   On November 19, 2018, the Company announced the abrupt termination of its

CEO, defendant Malecha. An analyst at BMO Capital Markets reported: "We believe this change

speaks to the severity of the issues at Goderich . . . ." Following this announcement, the price of

CMI stock declined by 8% over the following three days.

61.   Although defendants blamed the disappointing Salt segment results on lower

production rates, unbeknownst to investors, the true cause of the miss was caused by defendants'

concealment of and misrepresentations concerning the true costs associated with the CMCH

upgrade, the CMCH system's ability to produce salt targets, and the Company's annual salt

production capacity. That the Individual Defendants knew or recklessly disregarded that their

statements were false was not known until September 23, 2022.

62.     On September 23, 2022, the SEC issued a press release concerning its investigation

into the Company:

**SEC Charges Compass Minerals for Misleading Investors about Its Operations at World's Largest Underground Salt Mine**

**Company also Charged for Disclosure Control Failures Involving Mercury Contamination in Brazil**

The Securities and Exchange Commission today announced settled charges against Compass Minerals International Inc. for misleading investors about a technology upgrade that the company claimed would reduce costs at its most significant mine, but in reality, had increased costs, and for failing to properly assess whether to disclose the financial risks created by the company's excessive discharge of mercury in Brazil. Compass is ordered to pay $12 million to settle the charges.

According to the SEC's order, Compass repeatedly assured investors in 2017 that a technology upgrade at its Goderich mine – the world's largest underground salt mine which is located near Ontario, Canada and hailed by the company as its crown jewel – was on track to materially reduce costs and boost its operating results starting in 2018. Compass's statements were misleading because they failed to tell investors that costs at the mine were increasing rather than decreasing, which substantially undermined the projected savings. The SEC also found that Compass misled investors by overstating the amount of salt it was able to produce at Goderich.

Separately, the order finds that Compass's deficient disclosure controls resulted in the company failing to properly assess the financial risks of mercury contamination by one of its former facilities near the Botafogo River, in Pernambuco, Brazil, and that facility's cover-up of the misconduct by submitting inaccurate test reports to Brazilian environmental authorities. Compass was required to assess whether it must disclose the financial uncertainties of that misconduct to investors, but failed to do so.

"What companies say to investors must be consistent with what they know. Yet Compass repeatedly made public statements that did not jibe with the facts on—or

under—the ground at Goderich," said Melissa Hodgman, Associate Director of the Division of Enforcement. "By misleading investors about mining costs in Canada and failing to analyze the potential financial consequences of its environmental contamination in Brazil, Compass fell far short of what the federal securities laws require."

The SEC's order finds that Compass violated the antifraud, reporting, and internal controls provisions of the Securities Act and the Exchange Act and various related rules. In addition to the civil penalty, Compass, without admitting to the findings, agreed to cease and desist from further violations of these provisions, and retain an independent compliance consultant to review and make recommendations concerning its disclosure controls and procedures.[3]

63.     As a result of the foregoing, the Securities Defendants have been named as defendants in the Securities Action, which alleges Company investors were damaged when they purchased CMI shares from between October 31, 2017 and November 18, 2018.  The Securities Action has caused and will continue to cause significant damage to the Company.

**DAMAGE TO CMI**

64.      As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred substantial financial losses, including the costs of defending itself in the Securities Action, as well as additional losses, including reputational harm and loss of goodwill.

**DERIVATIVE ALLEGATIONS**

65.     Plaintiff brings this action derivatively for the benefit of CMI to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

66.     Plaintiff will adequately and fairly represent the interests of CMI and its stockholders in enforcing and prosecuting its rights.

67.     Plaintiff is an owner of CMI common stock and has been a continuous shareholder

---

[3] Press Release, SEC, September 23, 2022, available at https://www.sec.gov/news/press-release/2022-171.

of Company stock at all relevant times.

68.     At the time this action was commenced, the Board consisted of twelve directors, namely Individual Defendants Crutchfield, Dealy, Dowling, Jr., Ford, Joyce, Miller, Reece, Walker, Williams, and Yoder, and non-parties Chisholm and Wagnon.  Plaintiff is only required to show that six of the directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all twelve current directors, and if not all twelve at least the ten Individual Defendants, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

69.     A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the twelve current directors of CMI are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action. Indeed, none of the current directors, including non-parties Chisholm and Wagnon, took action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

70.     The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

71.     Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

72.     Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

73.     Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

74.     Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

75.     Individual Defendants Dealy, Reece, Walker and Yoder serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements. At all relevant times the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would

expose them to substantial liability and threaten their livelihoods.

76.     The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

77.     Furthermore, demand, in this case is excused as to all of the Company's current directors, including non-parties Chisholm and Wagnon, because the current directors control the Company and are indebted to each other. The current Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand upon them would be futile. Moreover, non-parties Chisholm and Wagnon, like the Individual Defendants, took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

## **COUNT I**

### **Violations of § 10(b) of the Exchange Act and Rule 10b-5**
### **Against The Individual Defendants**

78.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

80.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of CMI common stock.

82.    The Individual Defendants acted with scienter because they: (a) knew that the public documents and statements issued or disseminated in the name of CMI were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

83.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of CMI, their control over, and/or receipt and/or modification of CMI's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning CMI, participated in the fraudulent scheme alleged herein.

84.     As a result of the foregoing, the market price of CMI common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of CMI common stock in purchasing CMI common stock at prices that were artificially inflated as a result of these false and misleading statements.

85.     As a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. In addition, as a consequence of their breach of fiduciary duties, the Individual Defendants have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

**Breach of Fiduciary Duty**
**Against the Individual Defendants**

86.     Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

87.     Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligations of good faith, candor, loyalty, and due care.

88.     Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

89.     Defendants breached their fiduciary duties of good faith, disclosure, loyalty, and due care by making and/or authorizing false and misleading statements concerning the true costs associated with the CMCH upgrade, the CMCH system's ability to produce salt targets, and the

Company's annual salt production capacity.

90.     Defendants further breached their fiduciary duties to Company shareholders by failing to take remedial action against the other Individual Defendants and by concealing the other Individual Defendants' fraudulent statements and material omissions.

91.     The Individual Defendants further breached their fiduciary duties by failing to implement sufficient internal controls.

92.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CMI has sustained significant damages as alleged herein. As a result, the Individual Defendants are liable to the Company.

93.     Plaintiff, on behalf of CMI, has no adequate remedy at law.

## COUNT III

### Unjust Enrichment
### Against the Individual Defendants

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

95.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CMI.

96.     The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to CMI.

97.     Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

98.     As a direct and proximate result of the Individual Defendants' misconduct, the

Company has suffered significant damages, as alleged herein.

99.     Plaintiff, on behalf of CMI, has no adequate remedy at law.

## COUNT IV

### Aiding and Abetting Breach of Fiduciary Duty
### Against the Individual Defendants

100.     Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

101.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

102.     Plaintiff, on behalf of CMI, has no adequate remedy at law.

## COUNT V

### Waste of Corporate Assets
### Against the Defendants

103.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

105.     Defendants wasted corporate assets by, among other things, incurring and paying

legal costs to defend the Company and its officers against the Securities Action.

106.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

107.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

108.    Plaintiff, on behalf of CMI, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of CMI and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' violations of law, breaches of fiduciary duties, and unjust enrichment;

C.    Directing CMI to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CMI and its stockholders from a repeat of the damaging events described herein, including, but not limited to,

• strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

• strengthening the Company's internal reporting and financial disclosure controls;

• developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

• strengthening the Company's internal operational control functions.

D.    Awarding to CMI restitution from the Individual Defendants and awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees,

accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

Dated:  January 31, 2023                    **LAW OFFICE OF E. WAYNE TAFF**

                                            _/s/ E. Wayne Taff_____
                                            E. Wayne Taff (Bar No. 70588)
                                            3401 N Perrin Road
                                            Independence, Missouri 64058
                                            816-786-5083
                                            Fax 877-518-1942
                                            ewt@tafflawfirm.com
                                            _Attorneys for Plaintiff_

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**

Seth D. Rigrodsky
Herbert W. Mondros
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
sdr@rl-legal.com
hwm@rl-legal.com